## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| JAMES BRADY, (Detective, Retired),<br><br>Plaintiff,<br><br>v.<br><br>RICHARD TAMBURINI, individually and in his capacity as CHIEF, JOHNSTON POLICE DEPARTMENT and TOWN OF JOHNSTON,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  C.A. No. 1:17-CV-00475-MSM-LDA<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

The plaintiff, James Brady, a now-retired detective of the Johnston Police Department ("JPD"), has brought this action under 42 U.S.C. § 1983, asserting that the defendants, the Town of Johnston and the JPD's Chief, Richard Tamburini, violated his First Amendment right to free speech when they imposed discipline on him for comments he made to the *Providence Journal*. In deciding this motion, the Court must consider whether Detective Brady's comments are classified as protected speech and if the discipline imposed upon him for making those comments was violative of the United States Constitution.

Detective Brady has moved for partial summary judgment on the issue of liability and the defendants have moved for summary judgment on the entirety of Detective Brady's Complaint. For the following reasons, the Court GRANTS

1

Detective Brady's Motion (ECF No. 18) and DENIES the defendants' Motion (ECF No. 17).

## I.    BACKGROUND

At all relevant times, the Town of Johnston employed James Brady as a detective in its police department.[1]  Detective Brady simultaneously served as President of International Brotherhood of Police Officers, Local 307, the police union ("the Union").

On July 1, 2015, an officer of the JPD and Union member, Adam Catamero, initiated a traffic stop.  (ECF No. 1-1 at 2.)  A witness to the stop, Lisa Roberti, who knew the stopped driver and whose father was a police officer, intervened and later filed a complaint against Officer Catamero for "conduct unbecoming an officer."  *Id.* at 2-4.  As a result, Chief Tamburini suspended Officer Catamero.  *Id.* at 4.

On August 10, 2015, the Union filed a grievance against the Town of Johnston alleging that the suspension did not comport with just cause and was therefore in violation of the collective bargaining agreement.  *Id.* at 3.  The matter ultimately was brought to arbitration and Officer Catamero received an award in his favor on July 14, 2016.  *Id.*

Prior to the arbitration award, Chief Tamburini, on June 8, 2016, ordered Officer Catamero to a "fitness for duty" examination.  On June 1, 2016 Detective Brady had provided Chief Tamburini, with a memorandum concerning a comment

---

[1] Detective Brady voluntarily retired from the Johnston Police Department on December 7, 2017.  (ECF No. 16 ¶ 47.)

made by Officer Catamero.  According to this report Officer Catamero had said "I need to get something done, because when I put my uniform on, I feel like I want to kill someone." (ECF No. 17-4 at 3.)

Chief Tamburini ultimately terminated Officer Catamero on August 4, 2016. (ECF No. 16 ¶ 19; ECF No. 32 ¶ 58.)  Officer Catamero then filed a wrongful termination suit in this Court on August 31, 2016. (ECF No. 16 ¶ 20.)

On September 15, 2016, Detective Brady called Jacqueline Tempera, a reporter with the *Providence Journal*, to discuss Officer Catamero's termination. *Id.* ¶ 22. He made the call from his home, while off duty and after he had gotten out of the shower. *Id.* Detective Brady's official duties as a detective did not include speaking with the media; in fact, JPD policy precluded him from speaking with the media on behalf of the Department. (ECF No. 1-4 at 1.)

After this telephone conversation, the *Providence Journal* published an article titled "Johnston Police Officer Sues Town to Get His Job Back." (ECF No. 1-2.) The article reported that

> Detective James Brady, the union president, says high-ranking officers "didn't like the way [Catamero] did things," while working the detail. Namely, he would write traffic tickets for "anybody, no matter who they were."  And despite an "unwritten rule" where officers were encouraged to write more tickets that could be processed through Johnston Municipal Court than through the Rhode Island Traffic Tribunal he refused – continuing to work by the book, Brady said.  "He is a straightforward, all-business kind of guy …."

*Id.*

On September 20, 2016, Detective Brady received a "Notice of Internal Investigation Pursuant to the Law Enforcement Officers' Bill of Rights." (ECF No. 1-

6.)  Thereafter, on September 21, 2016, Ms. Tempera published another article in the *Providence Journal* titled "Johnston Police Union President Investigated for Speaking to Journal Reporter." (ECF No. 1-5.)  The article reported that Detective Brady was called into Chief Tamburini's office and notified that he was the subject of an internal investigation for speaking with the newspaper on September 15, 2016. *Id.* The article quoted the internal affairs notification, that stated: "in speaking with a reporter, Brady, 'brings the Department into disrepute' and 'impairs the operation of efficiency of the Department or officer.'" *Id.* Also quoted in the article was Steven Brown, the executive director of the Rhode Island Affiliate of the American Civil Liberties Union, who stated that prohibiting an employee from speaking to the media "raises very basic and serious First Amendment concerns," and that "[p]olice officers do not completely waive their First Amendment rights, especially if they are speaking in a capacity other than an employee." *Id.*

On October 13, 2016, Detective Brady was interrogated by the JPD's Professional Standards Investigator regarding his "September 15th, 2016 communications with Ms. Jacqueline Tempera of the *Providence Journal*." (ECF No. 1-8.)

On October 31, 2016, Chief Tamburini issued a two-day suspension to Detective Brady for speaking to the media.  *Id.*  In the suspension letter, Chief Tamburini wrote,

> [Y]ou maintain that you spoke with Ms. Tempera in your capacity as President of the [Union] and not in your capacity as Detective James Brady.  However, I have determined that your alleged distinction is not applicable in this instance.  And it does not exempt you from the

4

departmental rules and regulations.

*Id.*

Further, Chief Tamburini determined that Detective Brady was "speaking as a member of this department on internal departmental matters and as first-hand witness to the statements made by Mr. Catamero." *Id.*

> It is evident that your comments to Ms. Tempera were made in order to bring this department in to [*sic*] disrepute.  You implied … Mr. Catamero was separated from service because "high-ranking officers didn't like the (Catamero) did things."  And that there were "unwritten rules" in the department that he refused to follow.  You made this statement despite your first-hand knowledge of the statements that Mr. Catamero made to you and Lt. Guilmette, which ultimately lead to him being deemed unfit for duty.  You chose to feign ignorance as to those statements and opine that Mr. Catamero was separated from service because others in the department did not like him."

*Id.*

Chief Tamburini concluded that Detective Brady had violated the following JPD policies:

- #100.04, Section III(D)(1)(b), "Conduct Unbecoming an Officer";

- #100.04, Section III(D)(1)(v), "Dissemination of Information";

- #520.02, Section III(A)(2), "Public Information/Media Relations"; and

- #520.02, Section III(E)(1), "Internal Investigations."[2]

Detective Brady's comments to Ms. Tempera on September 15, 2016, were the basis of the punishment under each policy provision except the Internal Investigations Policy.  *Id.*  It was his subsequent conversation with Ms. Tempera, regarding the fact that an internal investigation had commenced for his prior

---

[2] The relevant text of these policies is available in the sections analyzing each, below.

comments to her, for which he was deemed to have violated the Internal Investigations Policy.  *Id.*

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment's role in civil litigation is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Garside v. Osco Drug. Inc.,* 895 F.2d 46, 50 (1st Cir. 1990).  Summary judgment can be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party.  A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." *Santiago–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 52 (1st Cir. 2000).

When examining cross-motions for summary judgment the applicable standard does not change, and the Court must "consider each motion separately, drawing all inferences in favor of each non-moving party in turn." *Green Mountain Realty Corp. v. Leonard,* 750 F.3d 30, 38 (1st Cir. 2014).

## III.    DISCUSSION

### A. Government Employee Speech and the First Amendment

"Speech by citizens on matters of public concern lies at the heart of the First Amendment, which 'was fashioned to assure unfettered interchange of ideas for the

bringing about of political and social changes desired by the people.'" *Lane v. Franks*, 573 U.S. 228, 235-36 (2014) (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)). As the Supreme Court first held in *Pickering v. Board of Education*, individuals do not relinquish their First Amendment rights by accepting employment with the government. 391 U.S. 563, 568 (1968). Notably, "speech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment." *Lane*, 573 U.S. at 240. "There is considerable value … in encouraging, rather than inhibiting, speech by public employees." *Id.* at 235-36. Were public employees "not able to speak on these matters, the community would be deprived of informed opinions on important public issues." *City of San Diego, Cal. v. Roe*, 543 U.S. 77, 82 (2004). "The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it." *Id.*

On the other hand, a government employer has an interest in controlling the operation of its workplace. *See Pickering*, 391 U.S. at 568. As such, there must be a "careful balance" … 'between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Lane*, 573 U.S. at 240 (quoting *Pickering*, 391 U.S. at 568 (1968)); *see also Decotiis v. Whittemore*, 635 F.3d 22, 29 (1st Cir. 2011). The government, therefore, may "impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." *U.S. v. Nat'l*

*Treasury Emp. Union*, 513 U.S. 454, 465 (1995) (hereinafter "*NTEU*"). *See also Jones v. Scotti*, 493 F. App'x 139, 141 (1st Cir. 2012) ("[T]he government acting as an employer 'has far broader powers' than does the government acting as sovereign.").

There are several aspects to the evaluation of a government employer's restriction of the speech of their employees. The first step is to determine if the disciplinary action involved a generalized prohibition or is instead a result of a particularized disciplinary action. If the restriction derived from a disciplinary action, then courts in the First Circuit generally employ a three-part inquiry, derived from *Pickering* and its progeny, to determine whether an adverse employment action against a public employee violates his or her First Amendment free speech rights. *See Decotiis*, 635 F.3d at 29-30; *Rodriguez-Garcia v. Miranda-Marin*, 610 F.3d 756, 765-66 (1st Cir. 2010); *Curran v. Cousins*, 509 F.3d 36, 45 (1st Cir. 2007).

> First, a court must determine "'whether the employee spoke as a citizen on a matter of public concern.'" Second, the court must "balance ... the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Third, the employee must "show that the protected expression was a substantial or motivating factor in the adverse employment decision." If all three parts of the inquiry are resolved in favor of the plaintiff, the employer may still escape liability if it can show that "it would have reached the same decision even absent the protected conduct."

*Decotiis*, 635 F.3d at 29–30 (internal citations omitted).

However, when a "a government employee's expression is restricted 'through a generally applicable statute or regulation, as opposed to a particularized disciplinary action,'" the appropriate standard is that provided in the Supreme Court decision of

8

*NTEU*, 513 U.S. 454. *Swartzwelder v. McNeilly*, 297 F.3d 228, 237 (3d Cir. 2002) (quoting *Latino Officers Ass'n, New York, Inc. v. City of New York*, 196 F.3d 458, 464 (2d Cir. 1999)).  In other words, *NTEU* applies when the challenged government activity is a prior restraint; that is, an official policy to prohibit speech before it happens.  Prior restraints are constitutionally suspect and come to the Court "bearing a heavy burden against constitutional validity," because of the likelihood "that communication will be suppressed, either directly or by inducing excessive caution in the speaker, before an adequate determination that it is unprotected by the First Amendment." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558 (1975); *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 390 (1973).  In the employment context, the trouble with a prior restraint is that it "'chills potential speech before it happens,' and thus 'gives rise to far more serious concerns than could any single supervisory decision.'" *NTEU*, 513 U.S. at 468.

In assessing the constitutionality of a prior restraint on government employee speech, the Court engages in a two-step analysis.  First, the Court determines whether the restriction regards matters of public concern.  *Id.* at 466.  The Court focuses on the text of the policy to make this determination.  *See Moonin v. Tice*, 868 F.3d 853, 861 (9th Cir. 2017).  If the prior restraint indeed inhibits speech on matters of public concern, the Court then considers whether the First Amendment interests of the plaintiff and the public outweigh the government's interest in functioning efficiently.  *NTEU*, 513 U.S. at 468; *Jordan v. Carter*, 428 F.3d 67, 72 (1st Cir. 2005).

Here, although there was disciplinary action against Detective Brady

individually, the policies at issue are generally applicable to employees of the JPD. Specifically, #520.02 imposes a clear prior restraint by prohibiting speech without the "express approval of the Chief of Police or the PIO." Similarly, #100.04 requires the following of "departmental procedures" for an employee's release of certain categories of information, including "prior approval of the Chief or Commanding Officer."

Detective Brady has made both facial and as-applied challenges to the JPD policies at issue. A facial challenge is not limited to the facts of a plaintiff's particular case; in the First Amendment context, a restriction on speech is deemed facially unconstitutional if it "punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep.'" *U.S. v. Ackell*, 907 F.3d 67, 72 (2018) (quoting *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003)). In contrast, an as-applied challenge requires a plaintiff "to demonstrate that the statute, as applied to his or her particular situation, violates" constitutional principles. *Hall v. INS*, 253 F. Supp. 2d 244, 248 (D.R.I. 2003). The Court will consider each of the JPD policies at issue, in turn.

### B. Johnston Police Department Policy #520.02(A)

JPD Policy #520.02(A), "Public Information/Media Relations," provides in relevant part as follows:

A. Persons Authorized to Disseminate Information

1. The Deputy Chief of Police is designated as the Department's Public Information Officer (PIO). Information, however, may be disseminated by the following personnel after approval by the Chief of Police or his designee:

    a) Uniform Division Commander

b) Investigative Division Commander
c) Operations and Training Commander
d) Traffic/Special Services Commander
e) Watch Commander

2. Requests from the news media that are directed to specific members of the police department will be directed to the PIO. Members are prohibited from disseminating information or granting an interview on police related matters without expressed approval of the Chief of Police or the PIO.

The first question for the Court is whether #520.02(A) impacts matters of public concern. *See NTEU*, 513 U.S. at 466. "Speech involves matters of public concern 'when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Lane*, 573 U.S. at 241 (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 2011)).

Matters related to the workings of a police department frequently have been held to be matters of public concern. *See, e.g.*, *Guilloty Perez v. Pierluisi*, 339 F.3d 43, 52 (1st Cir. 2003) ("The diligence and lawfulness of a police department's activities are matters of great interest to the public."); *Wagner v. City of Holyoke*, 241 F. Supp. 2d 78, 91 (D. Mass. 2003), *aff'd sub nom.*, 404 F.3d 504 (1st Cir. 2005); ("[S]tatements comprising evidence of possible corruption or exposing possible corruption within a police department are precisely the type of communications that demand strong First Amendment protection."); *Kessler v. City of Providence*, 167 F. Supp. 2d 482, 486 (D.R.I. 2001) (holding that "many police department policies, procedures, and rules affect, or have the potential to affect, the public health and safety and may qualify as 'matters of public concern'"); *see also Robinson v. York*, 566 F.3d 817, 822 (9th Cir.

11

2009) ("As a matter of law, 'the competency of the police force is surely a matter of great public concern.'").  On the other hand, matters related to police departments that could also be said of any place of employment, such as "individual personal complaints about working conditions," are not matters of public concern.  *See Tang v. State of R.I., Dep't of Elderly Affairs*, 163 F. 3d 7, 12 (1st Cir. 1998).

Here, #520.02(A) reaches matters of public concern.  The sweeping policy language— "police related matters"—encompasses far more than matters of unprotected speech and would preclude employees from speaking without permission on any issue relating to the Department.  This effectively bars comment on matters of public health and safety by those with the most knowledge. *See Providence Firefighters Local 799 v. City of Providence*, 26 F. Supp. 2d 350, 356 (D.R.I. 1998). (holding that matters affecting "public health and safety are clearly matters of public concern").  "Such an all-encompassing ban necessarily works to deprive Police Department employees of their First Amendment right, as citizens, to comment on matters of public [concern], thereby depriving the public of information regarding matters relevant to public health and safety." *Kessler*, 167 F. Supp. 2d at 487.

Having determined that #520.02(A) impacts speech on matters of public concern, the Court must next consider whether the plaintiff (and the public's) First Amendment interest is outweighed by the government's interest in "preventing unnecessary disruptions and carrying out its public service mission." *Guilloty Perez*, 339 F.3d at 52.  As noted, the government must meet a heightened burden to justify a prior restraint on speech as distinguished from an isolated disciplinary action.

12

*NTEU*, 513 U.S. at 468.  Specifically, "when the Government defends a regulation on speech as a means to ... prevent anticipated harms, it ... must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way."  *Id.* at 475.

Here, the defendants point the Court to an evaluation of their interests in the context of Detective Brady's conduct.  But the *NTEU* balancing test requires the Court to go beyond the facts of this case and consider whether the defendants' interest in restricting its employees' speech outweighs the interests of "present and future employees in a broad range of present and future expression," as well as their interests of their "potential audiences."  *See* 513 U.S. at 468; *see also Kessler*, 167 F. Supp. 2d at 488.

The defendants have not shown how curtailing *all speech* related to the police department detracts from their goals of maintaining accuracy, control, confidentiality, and efficiency in the conduct of officers. (ECF No. 17-1 at 26, 52). Moreover, they have failed to show how this sweeping regulation—restricting speech on any matter related to the police department—would prevent those (rather conjectural) harms.  In any event, the attainment of those government interests is not effectuated by this "clumsy and overbroad restriction[] on all speech" related to the police department.  *See Firefighters*, 26 F. Supp. 2d at 356.

As such, the weighing of the First Amendment interests against the defendants' interests in functioning efficiently tilts strongly in favor of Detective Brady.

### C. Johnston Police Department Policy #100.04(D)(1)(v)

JPD Policy #100.04(D)(1)(v), "Dissemination of Information," provides in relevant part as follows:

D. Prohibited Conduct

    1. The following acts by a member or employee of the Department are prohibited or restricted:

…

        v) Dissemination of Information- An officer shall treat the official business of the Department as confidential and shall conform to the following guidelines:

        (1) Information regarding official business shall be disseminated only to those for whom it is intended, in accordance with established departmental procedures.

        (2) An officer shall not remove or copy official records, reports or reproductions for a police installation except in accordance with established departmental procedures.

        (3) An officer shall not divulge the identity of a person giving confidential information except as authorized by property authority in the performance of police duties.

        (4) An officer shall not release to the press or news medical information concerning departmental policy or the evidential aspects of any criminal investigation without prior approval of the Chief or Commanding Officer. Consult with the Chief of Police when in doubt.

In contrast to #520.02(A), #100.04(D)(1)(v) is much more narrowly drawn. It concerns only the "official business of the Department" and does not, unlike #520.02(A), restrict speech "related" to the policy's subject. That is, the prior restraint of #100.04(D)(1)(v) applies only to the "official business" itself and not matters related

14

to that official business.  The distinction lies in the difference between "citizen speech" (which may be afforded First Amendment protection) and "employee speech" (which generally is not).  To be sure, "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Lane*, 573 U.S. at 240. However, some speech, such as that "the employer itself has commissioned or created" is employee speech. *Garcetti*, 547 U.S. at 421-22.  Thus, when the speech itself "owes its existence to a public employee's professional responsibilities" restriction of such speech "does not infringe any liberties the employee might have enjoyed as a private citizen." *Id.*

With that backdrop, the Seventh Circuit, considering a police department policy that restricted comment on "official agency business" interpreted that phrase as follows:

> The Policy covers only "official agency business," a phrase containing three separate components. First, the regulated information must be "business," rather than merely a topic of general interest. Of course, a police department's business may be of public interest, but the term at least removes anything tangentially "related to" the department from its coverage. Second, the term "agency" suggests that the business must be generated by or pertain to the [police department].  Third, and in our view most importantly, the regulated information must be "official," which typically means either "[o]f or relating to an office or position of trust or authority," or "[a]uthorized or approved by a proper authority." *Black's Law Dictionary* 1119 (8th ed. 2004).  By requiring the regulated speech to be "official," the Policy properly restricts only speech grounded in or owing its existence to the employees' job duties.

*Milwaukee Deputy Sheriff's Ass'n v. Clarke*, 574 F.3d 370, 383 (7th Cir. 2009).

Similarly, #100.04(D)(1)(v) refers only to "official business of the Department"

15

(not matters related to it), and therefore restricts only speech "grounded in or owing its existence to the employee's job duties." *See id.* It therefore does not restrict speech otherwise protected by the First Amendment.

Furthermore, the JPD's interest in restricting speech on official business outweighs the employee and the public's interest. Police officers do not have a First Amendment right "to speak in an official capacity on behalf of the police department." *Bates v. Mackay*, 321 F. Supp. 2d 173, 182 (D. Mass. 2004) (citing *Kotwica v. Tuscon*, 801 F.2d 1182, 1184 (9th Cir. 1986)). Indeed, the designation of a department spokesperson to speak on official business serves the "legitimate and substantial objective" of avoiding public confusion. *Swartzwelder v. McNeilly*, 297 F3d 228, 239-40 (3d Cir. 2002).

Policy #100.04(D)(1)(v) also restricts speech about ongoing investigations, "medical information concerning departmental policy," and confidential informants. The department has a strong and legitimate interest in controlling the release of information on specific enforcement efforts and ongoing investigations. *See Jones*, 493 F. App'x at 141; *Moonin*, 868 F.3d at 865; *Baumann v. District of Columbia*, 795 F.3d 209, 216 (D.C. Cir. 2015) ("It cannot be gainsaid that [a police department] has a weighty interest in preserving confidential information that, if released publicly, could jeopardize the successful conclusion of a criminal investigation.")

As such, Detective Brady's facial challenge to #100.04(D)(1)(v) fails. It is on his as-applied challenge to this policy, however, that he fares much better.

An as-applied challenge to an employer's specific retaliatory action requires

16

consideration of the *Pickering* factors rather than the *NTEU* analysis. First, the Court considers whether Detective Brady was "(1) speaking about a matter of public concern and (2) speaking as a citizen." *Foley v. Town of Randolph*, 598 F.3d 1, 5 (1st Cir. 2010); *see also Rodriguez-Garcia v. Miranda-Marin*, 610 F.3d 756, 765-66 (1st Cir. 2010); *Davignon v. Hodgson*, 524 F.3d 91, 100 (1st Cir. 2008). If the answer to either of these questions is "no" then the plaintiff has no First Amendment cause of action. *Foley*, 598 F.3d at 5. Should the answer be "yes," the plaintiff may sustain a First Amendment claim unless the "government entity had an adequate justification for treating the employee differently from any other member of the general public." *Lane*, 573 U.S. at 237. "If the balance weighs in favor of the employee, it must then be determined whether the protected speech was a 'substantial or motivating factor in the adverse action against the plaintiff.'" *Davignon*, 524 F.3d at 100 (internal citation omitted). Finally, if "the employee demonstrates that the speech was a substantial or motivating factor in the employer's retaliatory action, the employer may avoid liability by showing that it would have reached the same decision even absent the protected conduct." *Rodriguez-Garcia*, 610 F.3d at 765-66.

### 1. Detective Brady Spoke as a Private Citizen.

Detective Brady's statements to the *Providence Journal* were not made as part of his official duties. Indeed, JPD Policy #520.02(A)(1) designates the Deputy Chief as the Department's Public Information Officer ("PIO") to speak to the media. While the Chief or Deputy Chief may designate as PIO certain other officers in leadership positions, detectives, such as Officer Brady, are not on the list of acceptable designees.

17

Moreover, Officer Brady was off duty, at home, and getting out of the shower, when he made his comments by telephone to the reporter, Ms. Tempera. It is clear, therefore, that Detective Brady was speaking as a private citizen when he spoke to the reporter for the *Providence Journal* on September 15, 2016.

### 2. Detective Brady Spoke on a Matter of Public Concern.

Unlike the *NTEU* analysis, where the Court considers the text of the policy that is being challenged, the *Pickering* analysis requires the Court to consider the employee's speech itself. Whether restricted speech touches upon a matter of public concern "must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983).

In general, "[e]xposing governmental inefficiency and misconduct is a matter of considerable significance." *Garcetti*, 547 U.S. at 425. Possible corruption within a police department and the lawfulness of its activities are matters of public concern. *See Guilloty Perez*, 339 F.3d at 52; *Wagner*, 241 F. Supp. 2d at 91, *aff'd sub nom.*, 404 F.3d 504; *Kessler*, 167 F. Supp. 2d at 486 (D.R.I. 2001).

Here, the defendants attempt to paint Detective Brady's comments to the *Providence Journal* as merely a gripe about an internal personnel decision that he disagreed with. But Detective Brady's statements, while in the context of Officer Catamero's firing, revealed what he believed to be improper conduct in the JPD— favoritism in issuing parking tickets and the "unwritten rule" of processing more tickets through the municipal court than the state traffic tribunal. There is no First Amendment requirement that Detective Brady make this revelation in a vacuum;

18

that is, without reference to other potentially unprotected matters.  The Department

conduct he mentioned, which if true smacks of corruption, surely is a matter of public

concern.  *See Guilloty Perez*, 339 F.3d at 52; *Wagner*, 241 F. Supp. 2d at 91, *aff'd sub

nom.*, 404 F.3d 504.  Such revelations frequently come only from public employees

with inside knowledge.  For this reason, the Supreme Court has noted that there "is

considerable value … in encouraging, rather than inhibiting, speech by public

employees." *Lane*, 573 U.S. at 235-36.

### 3.  The Interests Weigh in Detective Brady's Favor.

In weighing the employee's and the public's First Amendment interest against

the government's interest in an efficient workplace, a court must consider "whether

the statement impairs discipline by superiors or harmony among co-workers, has a

detrimental impact on close working relationships for which personal loyalty and

confidence are necessary, or impedes the performance of the speaker's duties or

interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483

U.S. 378, 388 (1987).

The defendants have asserted that Detective Brady's comments impeded the

JPD's operations and adversely affected: (1) discipline by Chief of Police and the

higher-ranking officers; (2) harmony among co-workers; (3) working relationships in

the Department; (4) operations and efficiency of the Department; and (5) the

plaintiff's own duties as a detective with the subsequent internal investigation. (ECF

No. 19 at 23, 42-43.)

Indeed, "maintaining discipline and harmony in the workplace is a valid

Case 1:17-cv-00475-MSM-LDA    Document 35    Filed 02/09/21    Page 20 of 26 PageID #: 417


governmental interest." *Davignon*, 524 F.3d at 104-05 (quoting *Rankin*, 483 U.S. at 388). But to succeed in demonstrating its interest, the government must demonstrate, through evidence, "harm or increased risks"; "actual disruption" or, at the very least, the speech's potential to disrupt; or "internal conflict" *and* that this was in fact caused by the employee's speech. *Id.*; *Guilloty Perez*, 339 F.3d at 54; *O'Connor v. Steeves*, 994 F.3d 905, 916 (1st Cir. 1993).

Here, the defendants have presented no evidence from which a jury could find that such harms existed. It cannot therefore be held that the defendants' interest in disciplining Detective Brady's speech outweighed his right to speak and the public's interest in hearing it.

### 4. Detective Brady's Comments Were the Direct Cause of the Discipline Imposed.

There is no dispute that Detective Brady's comments to the *Providence Journal* were a "substantial or motivating factor in the adverse action against" him. *See Davignon*, 524 F.3d at 100. Moreover, the defendants do not attempt to argue that they "would have reached the same decision even absent the protected conduct." *See Rodriguez-Garcia*, 610 F.3d at 765-66. Detective Brady therefore prevails on this factor as a matter of law.

### D. Additional JPD Policies

Detective Brady challenges two other JPD policies upon which his discipline was imposed. First, he asserts that the "Conduct Unbecoming Policy" is an impermissible prior restraint with unlimited discretion and with no time limit for the Chief of Police to grant or deny permission to speak. Second, he argues that the

"Internal Investigations Policy," as applied to him, was violative of his First Amendment rights.

### 1. The Conduct Unbecoming Policy

The Conduct Unbecoming Policy, #100.04(D)(1)(b), provides as follows:

D. Prohibited Conduct

1. The following acts by a member or employee of the Department are prohibited or restricted:

b) Conduct Unbecoming an Officer- Conduct unbecoming an officer shall include that which brings the Department into disrepute or reflects discredit upon the officer as a member of the Department, or that which impairs the operation or efficiency of the Department or officer.

The Court does not find that the Conduct Unbecoming Policy is a prior restraint as nothing on its face is specific to speech.  It instead serves as a catchall disciplinary policy, which, in this instance, was used in response to Detective Brady's comments to the *Providence Journal*.

Detective Brady secondarily asserts that the Conduct Unbecoming Policy is unconstitutionally vague.  The vagueness doctrine "is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *see also Roberts v. United States Jaycees*, 468 U.S. 609, 629 (1984).  Generally, regulatory policies must give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he [or she] may act accordingly." *Grayned*, 408 U.S. at 108.

The First Circuit has generally foreclosed facial vagueness challenges to catchall disciplinary policies in the wake of *Arnett v. Kennedy*, 416 U.S. 134 (1974).

21

*See Brasslett v. Cota*, 761 F.2d 827, 838 (1st Cir. 1985); *Wishart v. McDonald*, 500 F.2d 1110, 1116 (1st Cir. 1974); *see also Wagner v. City of Holyoke*, 100 F. Supp. 2d 78, 86 (D. Mass. 2000).  In *Arnett*, the Supreme Court "stressed the impracticability of formulating an exhaustive list of actionable conduct, and the correlative need for a general removal provision." *Brasslett*, 761 F.2d at 838.

Again, however, as applied to the situation at bar, Detective Brady is correct in his interpretation of this catchall policy.  He could not reasonably expect that comments on a matter of public concern, spoken as a private citizen, as is his First Amendment right, could subject him to discipline for conduct unbecoming an officer. To hold otherwise would have the effect of chilling otherwise constitutionally protected speech. *See Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 872 (1997).

This case is distinguishable from *Wagner v. City of Holyoke*, where the court found that the plaintiff, an experienced officer, would know that his conduct fell within the purview of a similar conduct unbecoming policy.  100 F. Supp. 2d at 86. There, the officer disclosed a confidential internal affairs report to a news reporter. *Id.* at 81.  Here, Detective Brady did not disclose official business but rather informed the public about an "unwritten rule" regarding potentially improper practices at the JPD.

### 2.  The Internal Investigations Policy

The Internal Investigations Policy, #520.02(E)(1), provides as follows:

E. Internal Investigations

    1.  No member of the Johnston Police Department will discuss any ongoing internal investigation with the press/media. Any

22

> and all inquiries relating to internal investigations or crisis
> situations within the Department and the status of such will
> be referred to the Chief of Police.

The discipline imposed under this policy provision arises from Detective Brady's informing Ms. Tempera that there was an internal investigation of his conduct after he had spoken to her for her first article about Officer Catamero's lawsuit.  (ECF No. 1-8.)  This second conversation resulted in her article titled "Johnston Police Union President Investigated for Speaking to Journal Reporter."

The imposition of discipline under the Internal Investigations Policy violated Detective Brady's First Amendment free speech rights.  As the Court has determined that Detective Brady's comments to Ms. Tempera regarding the circumstances surrounding Officer Catamero's firing were protected speech, the investigation (and subsequent punishment) for those comments was unconstitutional.  It follows, then, that Detective Brady's statements to Ms. Tempera about this constitutional violation were a matter of public concern and the interest in providing this information to the public outweighed the JPD's interest.  Furthermore, in this case the officer was discussing an internal affairs investigation into his own conduct.  The JPD's interest in confidentiality is therefore less of a concern than in a case where the speaker is giving confidential information about another officer.

## E. Chief Tamburini's Qualified Immunity

Chief Tamburini asserts that he should be afforded qualified immunity from liability in his personal capacity and moves for summary judgment on that issue.  Under the doctrine of qualified immunity, courts are not authorized to award

damages against a government official in his or her personal capacity unless "the official violated a statutory or constitutional right," and "the right was 'clearly established' at the time of the alleged conduct." *Lane*, 573 U.S. at 243 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 734 (2011)); *see also Diaz-Bigio v. Santini*, 652 F.3d 45, 50 (1st Cir. 2011).

As described above, the discipline Chief Tamburini imposed upon Detective Brady violated his First Amendment right to speak as a citizen on a matter of public concern. The question here is, therefore, did the discipline involve a right that was clearly established at the time of the imposition of the discipline. The second prong, whether the right was "clearly established," has two subparts: "(1) the clarity of the law at the time of the alleged civil rights violation and (2) whether given the facts of the particular case a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights." *Lopera v. Town of Coventry*, 652 F. Supp. 2d 203, 211 (D.R.I. 2009), *aff'd*, 640 F.3d 388 (1st Cir. 2011).

The general right of an employee to speak on matters of public concern without retaliation was "clearly established" before 2016, the time of Detective Brady's punishment. *See Wagner v. City of Holyoke*, 404 F.3d 504, 509 (1st Cir. 2005) (holding that this right was "clearly established prior to 1994"). "But qualified immunity requires that the general right be placed in a reasonably specific context." *Id.* That is, the Court must "analyze whether the law is clearly established 'in light of the specific context of the case, not as a broad general proposition.'" *Hunt v. Massi*, 773 F.3d 361, 368 (1st Cir. 2014); *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir.

24

2009).  As the First Circuit has held:

> To be clearly established, the contours of this right must have been "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."  "In other words, 'existing precedent must have placed the … constitutional question beyond debate.'"

*Hunt*, 773 F.3d at 368 (internal citations omitted).

In the context of this case, the relevant question is whether Detective Brady had a clearly established right to speak to a reporter, outside of his official duties, about potential corruption in the JPD as a factor in another officer's firing at the time discipline was imposed upon him.  The Court finds, from existing precedent, that this right was sufficiently definite.  As noted, an officer's speech, as a citizen, about police department corruption is a public concern that outweighs countervailing government interests.  *See Guilloty Perez*, 339 F.3d at 52 ("The diligence and lawfulness of a police department's activities are matters of great interest to the public."); *Wagner*, 241 F. Supp. 2d at 91 (D. Mass. 2003), *aff'd sub nom.*, 404 F.3d 504 (1st Cir. 2005); ("[S]tatements comprising evidence of possible corruption or exposing possible corruption within a police department are precisely the type of communications that demand strong First Amendment protection.").

Chief Tamburini's action in disciplining Detective Brady is different from the facts of *Wagner*, where the police chief was entitled to qualified immunity because a reasonable superior officer could believe the plaintiff's speech, which included the disclosure of confidential materials and included unprotected and antagonistic speech, required discipline.  404 F.3d at 509.  In contrast, Detective Brady did not disclose confidential information or interfere with an ongoing investigation.  Chief

Tamburini observed that Detective Brady made comments about potential corruption in the police department and for that punished him.  This was an unconstitutional effort to stifle protected speech that any reasonable superior officer should have understood violated First Amendment rights.

Chief Tamburini therefore is not entitled to qualified immunity in this context.

## IV.    CONCLUSION

Based upon the foregoing, the Court determines that JPD Policy #520.02(A), "Public information/Media Relations," is an impermissible prior restraint on speech and that Policies #520.02(E)(1) "Internal Investigations," #100.04(D)(1)(b) "Conduct Unbecoming an Officer," and #100.04(D)(1)(v) "Dissemination of Information," were unconstitutionally applied to Detective Brady.  In addition, the applicable law and record evidence demonstrates that Chief Tamburini is not entitled to qualified immunity.

As such, the Court GRANTS Detective Brady's Motion for Summary Judgment on the issue of liability (ECF No. 18) and DENIES the defendants' Motion for Summary Judgment (ECF No. 17).

IT IS SO ORDERED.

Mary S. McElroy
United States District Judge
February 9, 2021

26